IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| KERRY KUSTES,<br><br>Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY, SCENIC STATE LINE d/b/a RC SMITH TRANSPORTATION, and CRAIG YEISLEY,<br><br>Defendants. | No. 3:06cv0133 JAJ<br><br><br><br>**ORDER** |

This matter comes before the court pursuant to Plaintiff Kerry Kustes' (Kustes) December 19, 2007 Motion for Partial Summary Judgment [dkt. 36]. Defendant Craig Yeisley (Yeisley) responded to plaintiff's motion on December 27, 2007 [dkt. 37]. Defendants Union Pacific Railroad Company and Scenic State Line (UP/SSL) resisted Kustes' motion on January 14, 2008 [dkt. 39] and filed their amended response to Kustes' statement of undisputed facts on January 17, 2008 [dkt. 44]. Kustes filed his reply brief on January 24, 2008 [dkt. 45].

### I. **SUMMARY OF THE ARGUMENTS**

Kustes moves for entry of partial summary judgment, i.e., a finding as a matter of law that SSL and its officers and employees were the "agents" of UP for purposes of his FELA claim and, as such, that UP is responsible for the actions or inactions of SSL and/or its employees under the Federal Employers' Liability Act (FELA) as they related to Kustes' claimed injury, sustained on December 8, 2005. UP/SSL resists Kustes' motion, arguing that the contract between UP and SSL expressly provides that SSL is an

independent contractor of UP. UP/SSL further argues that the contract between UP and SSL does not grant the extent of control necessary to declare, as a matter of law, that SSL is an agent of UP for purposes of FELA.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986). Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which it will bear the burden of proof at trial, there are genuine issues of material fact." Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985) (quoting Impro Prod., Inc. v. Herrick, 715 F.2d 1267, 1272 (8th Cir. 1983)).

The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. Id.

### III. STATEMENT OF MATERIAL UNDISPUTED FACTS

UP is in the business of transporting freight by trains in interstate commerce throughout the western half of the United States. UP's trains and SSL's vans run twenty-four hours a day, seven days a week. A train is operated by a conductor and an engineer.

Due to hours of service laws or other reasons, a train may go "dead" where it must stop between two terminals. To keep these trains operating, UP must transport a crew from a terminal to the location on the tracks where the train went dead and bring it in to the next terminal. This is called "dog catching" a train. The transportation of crews to pick up these dead trains is a necessary part of the railroad's operations. A crew can dog-catch a train by (1) riding on a train traveling toward the dead train, (2) having a railroad manager, clerk or other railroad employee drive the crew to the dead train, or (3) hiring another company to perform this operation for it. UP determines the method by which it transports its crews.[1]

In 2005, and for several years prior, if UP crews in the Clinton, Iowa, area would dog-catch a train by motor vehicle, they would ride in SSL's vans. Such trips were pursuant to a contract between SSL and UP. Such trips were something UP had to do to get its trains moving as part of its operations. UP can tell SSL who to pick up, where the driver was to pick up the crew, where to take the crew, the route to take, change the course of a trip, cancel a trip, and/or instruct the van to return. Generally speaking, UP controls how SSL's vans are equipped, does inspections of the vans and the drivers, controls the type of training, and controls the hours that the drivers are allowed to haul UP

---

[1]UP "qualified" this statement by stating that it makes the initial determination as to the method of transportation, but the crew is entitled to object. However, no appendix cite was included to support UP's denial. Thus, it will be treated as an admission. See Fed. R. Civ. P. 56(e); LR 56.b. The same is true for UP's denial of paragraphs 9, 17, 18, 19, 20, and 21. Regardless, UP's "denials" largely involved semantics and do not generate genuine issues of <u>material</u> fact bearing on Kustes' motion for partial summary judgment.

employees. Specifically, the contract between SSL (referred to as "Contractor") and UP (referred to as "Railroad) provides, in pertinent part:

> Section 1. SERVICES TO BE PROVIDED BY CONTRACTOR.
>
> Contractor, at its sole cost and responsibility, during the term of this Agreement, shall:
>
> A. Furnish and maintain motor vehicle passenger vehicles to transport safely and comfortably Railroad's train and engine crews, other Railroad personnel, and materials between points specified by Railroad's designated representatives. The vehicles shall be in safe and good operating condition;
>
> B. Provide drivers who are licensed to operate the motor passenger vehicles; and
>
> C. Be subject to call by Railroad's designated Representative to provide the following transportation services for Railroad's crews, other Railroad personnel, and materials at all times:
>
> - Long-haul (road): transportation services dispatched between points compensated based on mileage.
> - Yard: transportation services within defined areas surrounding a Railroad yard compensated based on time scheduled to perform.
> - Shuttle: transportation services performed on defined schedules and/or routes as agreed by Railroad and Contractor. Compensated based on mileage or time.
> - Others as requested by Railroad

Representatives.

Section 2.  CONTRACTOR'S COMPLIANCE WITH APPLICABLE LAWS.

The Contractor, and its drivers, shall at all times comply with all pertinent federal, state and local laws, ordinances, and vehicle inspection and licensing requirements of the states, counties, cities, towns, and villages traversed in the performance of services under this Agreement, as well as all state and federal passenger carrier licensing requirements, including the filing of necessary tariffs as applicable and provide evidence of the same.

Section 12.  INDEPENDENT CONTRACTOR.

    A.    Contractor and the agents and employees of Contractor are not and shall not be considered employees of Railroad.  Contractor shall be and remain an independent contractor and nothing herein contained shall be inconsistent with that status.  Contractor shall remove from service any driver for incompetence, neglect of duty, or misconduct, or for behavior detrimental to Railroad operations.  Railroad has the right to expect competence and safe performance from Contractor's drivers.  Railroad may report inadequate performance of Contractor's drivers to Contractor, and may terminate this Agreement for failure of competent and safe performance by Contractor's drivers, but Railroad shall have no control over the employment, discharge, compensation for, or service rendered by Contractor's employees or agents.  In the event that the Contractor exercises its sole and exclusive right to discharge any of its drivers who have provided hauling services on behalf of the Railroad and such driver initiates a lawsuit against the Railroad based upon any kind of a

wrongful discharge claim, Contractor agrees to indemnify and defend the Railroad from any reasonable and necessary expenses, claims, reasonable attorney fees, court costs, or damages whatsoever incurred by the Railroad in connection with said lawsuit.

Section 18.   VEHICLE CONDITION AND EQUIPMENT.

Vehicles used to provide services covered under this Agreement must accommodate the Railroad's request and be capable of transporting at a minimum seven (7) passengers (in addition to the driver) and their luggage in an efficient, comfortable and safe manner.  Further, vehicles used shall be suitable for the terrain and weather conditions of the location in which utilized.  Vehicles are required to have a cage or netting between the rear seat and the back doors to provide luggage and/or End-Of-Train device storage space during transit.  All vehicles used in these services must be no more than five (5) years old, in good mechanical condition, and must be equipped with the following:
- Air Conditioner
- Heater
- Seat belts for driver and all passengers
- First Aid kit
- 2.5 lb. (ABC) fire extinguisher
- Road flares or warning triangles
- Tire chains/snow studs where conditions warrant
- Jack and associated tools
- Reflective striping
- Backup alarm devices, whether mechanical or electrical, where not specifically prohibited by law.
- Sign with Risk Management Phone Number

All mechanical devices and items on the vehicle must be in good working order, with special attention paid to tires, brake systems, headlights (regular and high-beam), taillights, reverse lights, turn signals, market lights, and interior lamps.

Section 19.  RADIO AND RADIO COMMUNICATION.

Contractor must equip vehicles with radios capable of monitoring Railroad frequency. Contractor must keep radios on at all times and monitor the Railroad frequency for communication between individual Long-haul vehicles on duty. All operating rules for use of Railroad frequencies must be followed at all times. All vehicles must be equipped with a communication device that allows the driver and Contractor's dispatcher to relay messages. Equipment must be in good working order and can include, but is not limited to, two-way pagers, cell phones, GPS systems, or other means of communication as approved and specified by Railroad Representatives.

Section 20.  DISPATCHING REQUIREMENTS.

Contractor shall provide a twenty-four (24) hour per day dispatch service for its vehicles and drivers used in Long-haul service. Yard and shuttle vehicles will receive instructions through monitoring Railroad radio frequency.

Section 22.  RESPONSE TIME FOR EVMS SERVICE REQUESTS.

- A. Long-haul and backhaul EVMS service response time, defined as the time elapsed from Railroad's request for service via EVMS to Contractor's acceptance, rejection or counteroffer of request via EVMS shall be no more than ten (10) minutes.

- B. Contractor's Yard and shuttle service response time, defined as the time elapsed from Railroad's request for service via Railroad radio frequency or via in-person request to Contractor's acceptance of said request via Railroad's radio frequency or via in-person response, shall be as immediate as is reasonable.

- C. At locations where Contractor, not Railroad, serves as the Yard van service manager,

> Contractor is required to perform the following data entry via EVMS/CAS for each shift and for each Yard vehicle:
>
> - Within thirty (30) minutes of the beginning of each shift, assign a driver to each Yard vehicle.
> - At the beginning and end of each shift, enter odometer readings for each Yard vehicle.
> - At the end of each shift, enter the number of trips provided/taken during the shift.

This required information triggers the payment of the Yard vehicle services and as such is required daily for every shift in order for Contractor to receive payment for Yard vehicle services.

Section 23. PERFORMANCE; INPUT AND MAINTENANCE OF EVMS AND CAS DATA.

    A. Service commitments and representations made by Contractor become the basis by which Railroad plans and coordinates its crew movements to maintain on-time train operations. The minimum acceptable standard for response time performance is governed by response time requirements as defined in Section 22. Contractor shall provide accurate service commitments at the time of the acceptance of the order via EVMS. Service commitments that are not met by Contractor may be subject to damages by Railroad, contingent upon review by Railroad to determine if factors exist that are not within Contractor's control. Conduct of Contractor's employees is considered to be within Contractor's control. Contractor's performance shall be evaluated on a monthly basis by location, and it shall be based on the scorecard (see Attachment A). If contractor performance fails to meet expectations on a

specific location or locations as clearly defined on the scorecard, the following actions may be taken immediately after the monthly report:

- Contractor shall submit to Railroad Representative a written action plan for improvement by the 10th day of the following month if results shown on the Performance Scorecard are below goal.
- In the event subsequent Performance Scorecard results do not show improvement, a mandatory meeting with the appropriate Railroad Representative shall be initiated by the Contractor.
- Notwithstanding items 1. and 2. above, provisions of Section 11 remain in force.

Section 24. DRIVER HIRING AND SAFETY PRACTICES.

    A. All drivers employed by Contractor or acting on behalf of Contractor for services covered by this Agreement must have completed the following training and licensing:

        1. Defensive Driving Course.
        2. Operation Lifesaver Training, at the first available opportunity in each service area.
        3. Appropriate and current driver's license.
        4. Drug testing prior to hiring.
        5. Periodic random drug testing of all drivers after hiring.

    B. All drivers must be provided and carry with them at all times while on duty a logbook approved by the Department of Transportation/Surface Transportation Board. Alternatively, a computer- aided dispatching system that tracks drivers' hours of service may be used in lieu of logbooks. Logbooks must be available for review by any Railroad Representative at any time. If a computer-aided

dispatching system is used, Hours of Service information regarding a particular driver must be provided immediately upon Railroad Representative's request.

C. Contractor will supply each of its drivers with a company issued identification card containing the Contractor's name, logo, driver's name and driver's photograph. Railroad reserves the right to deny entry of Contractor's drivers to Railroad facilities if driver does not possess and display his/her identification card as described herein.

Section 25. DRIVER HOURS OF SERVICE.

Contractor and all drivers must comply with the Hours of Service of Drivers rules of the Federal Highway Administration (FHWA), U.S. Department of Transportation (USDOT), currently contained in 49 C.F.R., Part 395. More specifically, Contractor agrees to comply with the duties of a "motor carrier" as set forth in Part 395, including monitoring and maintaining records of each driver's hours of service. Said records shall be made available to Railroad upon demand. Contractor and Railroad agree that the FHWA Hours of Service of Drivers shall apply to all of Contractor's drivers performing services covered by this agreement, regardless of vehicle weight or vehicle passenger capacity.

Section 26. SMOKING IN VEHICLES.

Contractor agrees that no smoking shall be allowed in Contractor's vehicles at any time. This includes the Contractor's drivers smoking even if no Railroad Employees are in the vehicle. For those deadhead trips exceeding 100 miles, one (1) stop may be made for no longer than ten (10) minutes to allow the smokers a smoking break, provided that all passengers agree to this stop. Notwithstanding, Contractor shall not smoke on UP property.

SSL is not authorized to take the crews anywhere except where UP instructs it to go. If SSL if performing services for UP, it is not allowed to haul any materials or

persons for any other person or entity. UP can refuse to let a SSL driver haul its crews. SSL employees are required to abide by UP's policies and rules as set forth in the contract. UP uses SSL to haul its crews to allow UP's activities of operating trains to continue without interruption. If SSL had not been used to haul UP's crews, UP would have been required to transport its employees itself or find another means of transportation to continue its operations.

On December 8, 2005, Kustes was working as an engineer for UP. As part of the operations of the railroad, Kustes was required to ride the van from Clinton, Iowa, to Bertram, Iowa, to pick up the train. As part of the operations of the railroad, SSL was transporting two train crews, including Kustes, on December 8, 2005, from the yard in Clinton to Bertram when the accident occurred. Pursuant to the contract between SSL and UP, Kustes was picked up by an SSL van at the Clinton yard and was being transported to pick up a train near Bertram. The contract between SSL and UP provides that SSL would "furnish and maintain motor passenger vehicles to transport safely and comfortably railroad train and engine crews, other railroad personnel, and materials between points specified by the railroad's designated representative.

## IV. CONCLUSIONS OF LAW

Section 51 of FELA provides, in pertinent part:

> Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.

The Supreme Court addressed the scope of agency under FELA in Sinkler v. Missouri Pac. R. Co., 356 U.S. 326 (1958). The Court held that "when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer

within the meaning of §51 of FELA.

The undisputed facts establish that UP utilizes SSL, pursuant to contract, to transport crews to "dead" trains as part of UP's operational activities. While UP may have several options available to transport crews to "dead" trains, it is undisputed that UP used SSL on the date at issue to perform this function. That SSL is an "independent contractor" under the terms of the parties' contract is irrelevant to whether SSL is an "agent" of UP for purposes of FELA. As set forth above, UP exercises ample control over SSL's transportation of UP's crews. Plaintiff's motion for partial summary judgment is granted. The court finds that, for purposes of Kustes' FELA claim, SSL and its officers and agents were the "agents" of UP.

Upon the foregoing,

**IT IS ORDERED** that plaintiff's motion for partial summary judgment is granted. For purposes of Kustes' FELA claim, SSL and its officers and agents were the agents of UP.

**DATED** this 11th day of March, 2008.

_____
JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA